CITY OF CINCINNATI, APPELLEE, *v.* DAWSON, APPELLANT.
[Cite as Cincinnati v. Dawson (1977),
53 Ohio App. 2d 109.]

(No. C-77072—Decided July 20, 1977.)

*Mr. Thomas A. Luebbers, Messrs. Peck, Shaffer & Williams, Mr. John W. Fischer, Mr. Judson J. Allgood* and *Mr. Frederick O. Kiel,* for appellee.

*Mr. Philip S. Olinger* and *Ms. Patricia W. Morrison,* for appellant.

PALMER, P. J. This appeal arises from an action for a declaratory judgment brought by the city of Cincinnati against its then director of finance, James G. Flick, and his successor, Frank A. Dawson, to determine whether Flick and Dawson improperly declined to process certain Cincinnati ordinances authorizing $34,100,000 of unvoted general obligation bonds issued for various purposes, including waterworks, public buildings, equipment, and hospital improvements. It is agreed that the additional millage required to service these councilmanic bonds would, when added to millage required to service existing

indebtedness, exceed ten mills, or one percent of the assessed value of property within the taxing unit.[1] The defendant-appellant Flick, and later Dawson, declined to certify the ordinances to the county auditor because of apprehension that the issuance of the bonds would violate provisions of the Ohio Constitution and various statutory enactments in aid thereof. The trial court, after extensive arguments, entered its judgment declaring: "* * * [D]efendant has wrongfully refused to certify the bond ordinances to the county auditor, for the ten-mill limitation does not apply to the city of Cincinnati's tax levies." The defendant filed a timely appeal from this judgment, urging a single assignment of error: that the judgment of the trial court, in holding that various provisions of the charter of Cincinnati relieved it from the strictures of the ten-mill limitation, was contrary to law.

The resolution of this issue becomes, since there exist no factual dispute and no controlling or minimally helpful precedent, a matter of interpreting the intent and meaning of the several public enactments, constitutional, statutory, and charter. Rather than a seriatim recitation of these enactments, which, without gloss, can be something less than instructive given the complexities of the subject matter, it will be, we believe, useful—as it is certainly permissible—to examine them, in turn, in their historical context together with such legislative motivation for and circumstances surrounding enactment as the record and available documentation will permit us to bring to bear.[2] R.

---

[1] At the time of trial, it was agreed that existing indebtedness amounted to 9.842 mills from the city of Cincinnati and Hamilton County, the latter being the only overlapping taxing district having unvoted debt, with the instant bonds adding 2.29 additional mills. As of March 1977, these figures decreased slightly to 9.365 and 2.28, respectively, but then and now will exceed the ten mill limitation.

[2] In this search for historical authenticity and legislative purpose, we acknowledge our substantial reliance upon, inter alia, the affidavit of Mr. Charles P. Taft, one of the participants in many of the events described herein, whose recitation of events and legislative intent stands uncontroverted in the record before us, and unchallenged by anything our research has revealed to us.

C. 1.49; 50 Ohio Jurisprudence 2d 234, Statutes, Section 250 *et seq.*

In November 1933, the electors of this state adopted Section 2 of Article XII of the Constitution of Ohio, providing in part:

"No property, taxed according to value, shall be so taxed in excess of one per cent of its true value in money for all state and local purposes, but laws may be passed authorizing additional taxes to be levied outside of such limitation, either when approved by at least a majority of the electors of the taxing district voting on such proposition, or when provided for by the charter of a municipal corporation. * * *" (Amended in other respects, effective July 1, 1975.)

This enactment replaced earlier sections providing a "one and one-half per cent" or fifteen mill limitation in a 1929 amendment, effective in 1931, which in turn replaced a 1918 section (and earlier enactments) without such millage limitation. See *State, ex rel. Ohio National Bank,* v. *Hudson* (1938), 134 Ohio St. 150 at 161. These constitutional provisions, however, *reflected* rather than established or initiated public policy; the battles had been, and continued to be fought in the General Assembly, whose enactments we must look to for more instructive guidance. Thus, as early as 1910, there existed statutory limitations on millage levied by municipalities. The Smith One Per Cent Law, G. C. 5649-2 to 5649-5b, fixed a limitation of 10 mills for *all* purposes, both operations and debt service, on tax levies imposed by municipalities.

"The Smith one per cent law was enacted in response to a popular demand for legislative action fixing a definite restriction and limitation upon the rate of tax levies, for the evident purpose of limiting the expenditure of public funds and bringing about a more just return and valuation of property for the purposes of taxation. It provides in substance that the maximum rate of taxes that may be levied for all purposes, upon the taxable property within a taxing district, shall not in any one year exceed ten mills on each dollar of the tax valuation of the taxable property of

such taxing district for that year." *State, ex rel. Menning, v. Zangerle* (1916), 95 Ohio St. 1, 6.

Although eased by subsequent legislation to 15 mills (*State, ex rel. City of Akron,* v. *Slusser* [1944], 144 Ohio St. 123 at 124), the limitation apparently proved unreasonably restrictive and certain cities were forced to borrow money for operating deficits. We are told that in 1925 the city of Cincinnati had over $6,000,000 in such deficit bonding.

In any event, beginning in the early 1920's, a substantial movement commenced to secure legislative relief for the hardpressed cities eventuating in the passage of a series of bills in 1925 which, among other things, limited the purpose for which bonds could be issued and regulated their form, provided certain budgetary reforms, and, more importantly for our purposes, provided a home rule operating millage limitation bill. This latter legislation, known as the Tallentire Act, provided in its original form as follows:

"The provisions of sections * * * [here follow numerous General Code sections affected by the legislation, including those providing millage limitations] shall not apply to any municipality, which by its charter or amendment thereto provides for a complete budget system of municipal receipts and expenditures, and further provides for a limitation on the total tax rate which may be levied without a vote of the people *for all purposes or for current operating expenses* by the legislative authority of such municipality in each year on the tax list of real and personal property therein." G. C. 5649-10. (Emphasis added.)

This legislation, effective January 1, 1926, was designed in sum to serve a number of fiscal needs and reforms, one of which was to relieve the pressure on cities caused by limitations on debt service millage. Home rule cities were permitted by charter to divorce themselves from the Smith Act stricture by adopting limitations on the total unvoted tax rate either for all purposes *or* for current operating expenses. The suggestion that the disjunctive "or" was inadvertent in the act, and that the

legislation intended relief from total millage limitations only when the charter provided a millage limitation "for all purposes" was decisively, and we conclude correctly, rejected by this court in *State, ex rel. Thomas,* v. *Heuck* (1934), 49 Ohio App. 436, 441, 442. A contrary holding would, in effect, eviscerate one of the primary objectives of this remedial legislation, *viz.,* the provision of relief from unreasonably restrictive limitations of debt service millage, and would, in addition, do violence to the plain language of the legislation.

Contemporaneously with the consideration and enactment of the above legislation, the electors of the city of Cincinnati had, in 1924, authorized the creation of a charter commission which by 1926 had drafted and presented to the electorate a charter for the city which was adopted at the general election in November 1926.[3] Article VIII of the charter, after assuming all powers of municipal home rule and taxation granted by general law (Section 1) and establishing the prerequisite budget system required by the Tallentire Act (Section 2), provided thereafter,[4] as follows:

"Section 3.

"The council shall annually levy a tax for *current operating expenses* on the real and personal property in the city for the purposes of the city of Cincinnati, its boards, departments and institutions. The rate of such tax shall not exceed six and sixty-five hundredths (6.65) mills on the dollar of assessed valuation. Out of said total maximum levy fifty-five hundredths (.55) of a mill may be levied only for the purposes of the University of Cincinnati, and at the request of the board of directors of the said University all or any part of said rate shall be le-

---

[3] One of the members of this commission, Robert A. Taft, later United States Senator from Ohio, had been instrumental as a state legislator in drafting and securing passage of the remedial state acts in question, and, as a member of the charter commission, drafted the financial sections of the charter, including those designed to give effect to the Tallentire Act.

[4] The quoted language from the charter is as it appears in its present form.

vied. Out of said total maximum levy one-tenth (1/10) of a mill may be levied only for recreational purposes and at the request of the public recreation commission all or any part of said rate shall be levied. * * *

"Section 4.

"The council shall annually levy *outside of the limitations provided in this charter* a sufficient sum to pay the interest, sinking fund and retirement charges on all bonds and notes of the city of Cincinnati, lawfully issued, rents due on perpetual leaseholds of the corporation not payable from a special fund, and the expenses incident to the management of the sinking fund, which entire levy shall be placed before and in preference to all other levies. Amounts certified under the laws of the state as necessary for such purposes shall not be subject to change by the council." (Emphasis added.)

It is apparent, therefore, that the charter provided in Section 3, and continues to so provide, an express limitation on "the total tax rate which may be levied without a vote of the people * * * for current operating expenses * * *," as required by the Tallentire Act, and that it contemplated, in Section 4, a levy "outside the limitations provided in this charter," i. e., the limitation of 6.65 mills on current operating expenses in Section 3 of Article VIII, sufficient to pay its lawful debt service.

It is the position of the city of Cincinnati, with which we find ourselves in agreement, that these charter provisions were enacted with the purpose of complying with the requirements of the Tallentire Act and with the effect of freeing the city of the necessity of confining its debt service millage within the Smith Act (and its successor statutes) ten-mill limitation. *State, ex rel. Thomas,* v. *Heuck, supra.* We fail to find anything in the Revised Code today which would require us to alter this conclusion as to purpose and effect. Thus, the Smith Act has been succeeded—after a number of transformations—by R. C. 5705.02. It reads as follows:

"The aggregate amount of taxes that may be levied on any taxable property in any subdivision or other taxing unit shall not in any one year exceed ten mills on each

dollar of tax valuation of such subdivision or the taxing unit, except for taxes specifically authorized to be levied in excess thereof. The limitation provided by this section shall be known as the 'ten-mill limitation,' and wherever said term is used in the Revised Code, it refers to and includes both the limitation imposed by this section and the limitation imposed by Section 2 of Article XII, Ohio Constitution.

The Tallentire Act is now embodied within R. C. 5705.18, which reads, in material part, as follows:

"Sections 5705.02 and 5705.32 of the Revised Code do not apply to the tax levies of any municipal corporation which, by its charter or amendment thereto, provides for a limitation of the total tax rate which may be levied without a vote of the people for all the purposes of the municipal corporation, or for the current operating expenses thereof. Said charter or charter amendment may also provide for the levying of taxes by said legislative authority in excess of said charter limitation upon approval by the majority of the electors of said municipal corporation voting thereon at a November election."

The defendant argues that it is unreasonable to construe R. C. 5705.18 to relieve a municipality from the ten-mill limitation imposed by Section 2, Article XII, of the Ohio Constitution, and R. C. 5705.02 where its charter does no more than provide a ceiling on current operating expense millage. But, as we have seen, the act was designed for precisely the purpose of allowing home rule cities to relieve themselves from unreasonably harsh debt service limitations by electing to adopt alternate forms of limitation and by being required to follow certain restrictive procedures,[5] freeing from the ten-mill stricture the financial resources necessary to service lawfully incurred debt.

It is also urged by the defendant that the interpreta-

---

[5]These included the adoption of budgetary controls (see G. C. 5649-10), limitations on the purpose and length for which bonds may be issued, requirements that the bonds contain, as an integral part, provision for their own amortization (Section 11, Article XII, Ohio Constitution) and an overall limit on the tax rate (R. C. 133.03).

tion sought by the plaintiff and approved by the trial court is unthinkable because of its inherent capacity for abuse by the municipality. Two principal factors limit, it seems to us, the force of this argument: first, the provisions of R. C. 133.03 do, in fact, provide a limit for net unvoted indebtedness of 5½ per cent of the total value of all taxable property beyond which the city may not proceed, and, secondly, the existence of the very real inhibition provided by the necessity of periodic councilmanic elections at short intervals. It is a councilman with a short memory and a limited future who permits himself to become known as a quick man with the public purse. These and other factors, including the realities of the bond market, mitigate much of the defendants' parade of the horribles.

We conclude, therefore, as did our predecessors in *State, ex rel. Thomas,* v. *Heuck, supra,* that the charter of the city of Cincinnati was designed to and did in fact bring itself within the meaning and intent of the predecessor of R. C. 5705.18 and of Section 2 of Article XII of the Ohio Constitution by the adoption of charter limitations on current operating expenses, the effect of which was and continues today to remove the charter levies of plaintiff city from the ten-mill limitation provided by general law. The assignment of error is accordingly overruled, and we affirm the judgment of the trial court.

*Judgment affirmed.*

KEEFE and BLACK, JJ., concur.